UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAMAL ANWIYA YOUKHANNA,
*et al.*,

          Plaintiff,

                                    Case No.: 17-cv-10787

v.                                 Honorable Gershwin A. Drain

CITY OF STERLING HEIGHTS, *et al.*,

          Defendants.

_____/

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [#9]

### I. INTRODUCTION

On March 13, 2017, Plaintiffs Kamal Anwiya Youkhanna, Josephine Soro, Wafa Catcho, Marey Jabbo, Debi Rrasi, Jeffrey Norgrove, and Megan McHugh filed the instant 42 U.S.C. § 1983 action against Defendants City of Sterling Heights and its Mayor, Michael C. Taylor, alleging the Defendants violated their fundamental rights protected by the First, Fourth, and Fourteenth Amendments, as well as Michigan's Open Meetings Act, MICH. COMP. LAWS § 15.263 *et seq*., by entering into a Consent Judgment with the American Islamic Community Center ("AICC"), which allows the construction of a mosque on 15 Mile Road in the

City. *See American Islamic Community Center, Inc. v. City of Sterling Heights*, No. 1:16-cv-12920 (E.D. Mich. Mar. 10, 2017).

Presently before the Court is the Plaintiffs' Motion for Preliminary Injunction, filed on March 17, 2017. Plaintiffs seek an order preliminarily enjoining the City from enforcing the Consent Judgment. The Defendants filed a Response in Opposition on April 3, 2017, and Plaintiff filed a Reply in support on April 10, 2017. On June 13, 2017, the Court granted Defendants' Motion to File Supplemental Brief. Plaintiffs filed a Response to Defendants' Supplemental Brief on June 14, 2017.

On April 14, 2017, the Court granted the AICC's Motion to File an Amicus Brief.[1] Plaintiffs filed their Response to the AICC's Amicus Brief on April 19, 2017. On April 19, 2017, the AICC filed Supplemental Authority in Opposition to Plaintiffs' Motion for Preliminary Injunction. Lastly, the United States filed a Statement of Interest pursuant to 28 U.S.C. § 517 on April 13, 2017. Plaintiff filed a Response to the United States' Statement of Interest on April 19, 2017.

---

[1] The AICC's Amicus Brief raises the issue of Plaintiffs' standing to bring the instant action. The Court has decided to consider this issue at a later date so that the Defendants and the Plaintiffs may have an opportunity to brief the issue of standing. As such, the Court will address the AICC's standing argument in a separate order.

A hearing on the Plaintiffs' Motion for Preliminary Injunction was held on June 20, 2017. For the reasons that follow, the Court will deny the Plaintiffs' Motion for Preliminary Injunction.

## II. FACTUAL BACKGROUND

The instant action stems from the AICC's ongoing efforts to have a mosque built in the City. The AICC is a Michigan nonprofit religious organization that serves the Muslim community in Macomb and Oakland Counties. The AICC community is comprised of 100 members that represent approximately 300 family members. The AICC selected the City because eighty percent (80%) of its members reside in the City. The AICC currently meets at a property located at 27205 Dequindre Road in Madison Heights, Michigan.

The AICC offers a variety of services to the local Muslim community, including weekly Thursday programs, a Friday afternoon group prayer service, Sunday breakfast and youth program, a program for young children that teaches Arabic and the fundamentals of Islam, community retreats and other activities. The Friday afternoon service, which is called Jumma, is the most important service of the week for Muslims akin to Christian mass on Sunday. A mosque is the principal religious building of Islam, and paramount among its many functions is communal prayer. The architectural design is based on liturgical elements leading the participant to orient towards group prayer.

In February of 2012, AICC members began searching for vacant property in the City on which a mosque could be constructed. In May of 2014, the AICC learned of real property along Fifteen Mile Road that was for sale that it believed was an ideal site for AICC's new mosque. The property consists of five contiguous parcels under single ownership. AICC currently leases the property and has an option to purchase it upon obtaining City approval to construct a mosque on the premises.

Under the City's Zoning Ordinance ("SHZO"), "places of worship" are not permitted as of right in any of the City's 23 zoning districts. However, "places of worship" are expressly allowed in Residential (R-60) zoned areas through Special Approval Land Use ("SALU") under the SHZO. To qualify, the place of worship must demonstrate the proposed construction meets the objective standards of the SHZO along with general discretionary standards listed for consideration in the SHZO. In contrast, the SHZO allows certain secular assemblies as of right in the R-60 zone, including "[c]ity-owned and/or operated libraries, museums, administrative offices[,] parks and recreational facilities."

The specific standards set forth in the SHZO for special approval land use relate to height and setback requirements, a requirement that places of worship be on a major or secondary road, parking requirements, and requirements for auxiliary

uses.  Specifically, the specific standards are articulated in §3.02 of the SHZO and

state:

## SECTION 3.02.  SPECIAL APPROVAL LAND USES.

The following uses, and other similar to those cited in this article, may be permitted by the Planning Commission subject to the general standards of section 25.02 and the specific standards imposed for each use:

A.      Churches, synagogues, mosques and places of group worship, subject to the following:

1.      Buildings of greater than the maximum height allowed in this district may be permitted, provided front, side and rear yards are increased above the minimum required yards by one foot for each foot of building height that exceeds the maximum height allowed.

2.      All ingress to and egress from the site shall be directly onto a major or secondary thoroughfare having an existing or planned right-of-way width of at least 86 feet as indicated on the Master Road Plan;

3.      Parking lot screening meeting the requirements for moderate intensity impacts shall be provided as required in section 24.01;

4.      Such facilities may include related community centers, provided that such centers are limited to activities sponsored by church members only. Said facilities shall not be used as banquet facilities to the general public;

5.      All principal and accessory buildings, except for accessory storage buildings, such as a shed or detached garage, shall maintain rear and side yard setbacks of at least 50 feet.


The general standards for special approval land use include factors such as

harmony with the neighborhood, safe traffic flow, and impact on the development

or use of neighboring properties. Specifically, the general standards are articulated in § 25.02 of the SHZO, and state:

**SECTION 25.02 GENERAL STANDARDS.**

A.    The proposed special approval land use shall be of such location, size and character that it will be in harmony with the appropriate and orderly development of the surrounding neighborhood and/or vicinity and applicable regulations of the zoning district (including but not limited to any applicable performance standards) in which it is to be located.

B.    The proposed use shall be of a nature that will make vehicular and pedestrian traffic no more hazardous than is normal for the district involved, taking into consideration vehicular turning movements in relations to routes of traffic flow, proximity and relationship to intersections, adequacy of sight distances, location and access of off-street parking and provisions for pedestrian traffic, with particular attention to minimizing child-vehicle interfacing.

C.    The proposed use shall be designed as the location, size, intensity, site layout and periods of operation of any such proposed use to eliminate any possible nuisance emanating therefrom which might be noxious to the occupants of any other nearby permitted uses, whether by reason of dust, noise, fumes, vibration, smoke or lights.

D.    The proposed use shall be such that the proposed location and height of buildings or structures and location, nature and height of walls, fences and landscaping will not interfere with or discourage the appropriate development and use of adjacent land and buildings or unreasonably affect their value.

E.    The proposed use shall relate harmoniously with the physical and economic aspects of adjacent land uses as regards prevailing shopping habits, convenience of access by perspective patrons, continuity of development and need for particular services and facilities in specific areas of the city.

F.    The proposed use is so designed, located, planned and to be operated that the public health, safety and welfare will be protected.

G.   The proposed use shall not be detrimental or injurious to the neighborhood within which it is to be located, nor shall such use operate as a deterrent to future land uses permitted within said zoning district and shall be in harmony with the general purpose and intent of the zoning ordinance.

On June 16, 2015, the AICC submitted its SALU Application.  On August 13, 2015, the Planning Commission conducted a public hearing on the AICC's SALU Application.  Prior to the meeting, the City Planning Commission prepared a Staff Report, which states that "[t]he Office of Planning has completed its review and has determined that all of the specific conditions contained under Section 3.02A and other applicable design standards identified under Zoning Ordinance No. 2788 have been met[.]"  *See* Def.'s Resp., Ex. B at Pg ID 540.  While the Staff Report indicated that the AICC's SALU Application met all requirements of the SHZO, it included  "alternative motion language . . . if the Planning Commission elects to deny or postpone the request . . . ."  *Id.* at Pg ID 542.[2]

At the beginning of the meeting, City Planner Donald Mende explained the special land use requirements under the SHZO and that the proposed mosque met these objective requirements.  *See* Def.'s Resp., Ex. D at Pg ID 570.  He indicated

---

[2] Plaintiffs mischaracterize the August 13, 2015 Staff Report.  They advance two different theories concerning the object of the Staff Report.  They first argue that the report "was not a recommendation by the Planning Commission to approve the AICC Application.  Rather, it was a recitation of reasons that the Commission could vote to either approve, or alternatively, deny the AICC Application."  *See* Plfs.' Mot., Decl. of Jeffrey Norgrove at Pg ID 250.  Plaintiffs also argue that the August 2015 staff report provided two recommendations: a motion to approve and a motion to deny.  *See* Plfs.' Resp. to Statement of Interest at Pg ID 1058-59.

that the mosque would cover approximately 11% of the entire 4.3 acre parcel. *Id.* He noted that the height of the spires and dome complied with the SHZO because of the increased setbacks. *Id.* He noted that a church in the City had a 75-foot tall steeple, which was taller than the proposed mosque's 58-dome and 66-foot spires. *Id.* He added that the SHZO requires 109 parking spaces, and AICC's proposal provides for 130 parking spaces. *Id.* Lastly, he noted that the location of the mosque on a "major thoroughfare" was also appropriate, as worship facilities need only be located on "secondary roads." *Id.*

Mende further explained that, with respect to the subjective/discretionary standards set forth in § 25.02, the AICC had offered to a) use non-reflective paint on the dome structures; b) utilize no audio devices outside of the building; c) conduct all activities inside of the building (except for a small children's play area); d) refrain from objecting to the granting of liquor licenses to nearby establishments; and e) prevent the multi-purpose room from being rented to the general public.

After Mr. Mende spoke, several audience members raised questions about traffic, overall size, use of the building and safety. Some comments were directed at the AICC's religion including a plea to "remember 911," statements that

Christians would not be allowed to build a church in Iraq, and statements that property values would drop if a mosque were built in the neighborhood.

Plaintiff Norgrove,[3] one of the Planning Commissioners, indicated he would entertain a motion to postpone because he would "not feel comfortable making a decision" at that time. In response, Planning Commissioner Jerry Rowe suggested a postponement to allow AICC to "review the scale of the development." Planning Commissioner Stephan Militello responded, "I would be against [postponing] . . . if this was a church, a Catholic Church or anything else, we wouldn't be, we wouldn't [need a postponement]." The Planning Commission then voted 6 to 1 to postpone the matter.

Following the City Planning Commission meeting, public opposition against the AICC's SALU Application continued to mount. At a City Council meeting on August 18, 2015, a resident raised a picture of a woman wearing a garment covering her head and stated that he did not want to "be near people like this." Another resident objected that the mosque might be used to store weapons, while

_____

[3] Norgrove is also alleged to hold bias against Muslims and improperly attempted to influence the other Planning Commissioners by contacting them in between the first and second planning commission meeting and informing them that he would be making a motion to deny the SALU Application. Norgove has allegedly opposed the construction of a different mosque in 2011 and posted anti-Muslim statements on social media, "Oh now the terrorists are gonna attack, according to the media this weekend. Come to the Detroit area. They don't [sic] bomb their revenue source." Norgove is also alleged to have shown a picture on social media with the statement "share this pig if your [sic] not celebrating Ramadan [sic]."

another resident argued that Homeland Security should screen the AICC because "they're cutting people's heads off, they kill our soldiers . . . ."   As opposition continued, the Mayor announced he opposed the Application contrary to his position after the August 13, 2015 meeting.   Additionally, Plaintiff Norgrove attended a protest against the SALU Application's approval.

On August 28, 2015, the AICC's architect submitted revised plans to the Planning Commission in an effort to address some of the Planning Commission's concerns.  The AICC's revised plans included a reduction to the height of the two spires.  The Planning Commission issued a second staff report dated September 10, 2015, which concluded that the AICC's "minimal amendments to the architectural plans . . . do not support a finding that the proposed special approval land use comports with the General Standards."   Based on this conclusion, it was recommended that the Commission deny the AICC's SALU Application.

On September 10, 2015, over 200 people appeared at the Planning Commission meeting.  At the meeting, the City Planner reported that AICC had agreed to reduce the height of the spires by approximately 13%, but increased the size of the dome by 12%.  At the conclusion of the meeting, Norgrove made a motion to deny the application for the following reasons:

> 1.      The location and height of the proposed building interferes with and discourages the appropriate development and use of adjacent land

and buildings with the height exceeding that of other structures in the immediate area by more than 30 feet at some points in the proposed building. Ordinance General Standards 25.02A and D;

2.      The square footage of the proposed building in comparison to the size of the parcel is excessive and not compatible with established long term development patterns of this R-60 (One Family Residential) Zoning District. Ordinance General Standards 25.02 A and D;

3.      That given the approximate 20,500 square foot size of the proposed building and the allocation of the floor space to ancillary uses, there is likely shortage of off-street parking when the principal and the ancillary uses are combined, particularly during times of maximum capacity prayer hall usage. Ordinance Standards 25.02B;

4.      Section 23.02 B1 of the ordinance requires additional parking spaces for ancillary uses which are not addressed in the architectural and site plans;

5.      The scale of the proposed building on this site is not harmonious with the scale of the existing buildings situated in the vicinity of this R-60 (One Family Residential) zoning district and in neighboring areas. Ordinance General Standards 25.02A,E,F & G.

The Planning Commission's vote to deny the AICC's SALU Application "triggered a brief, spirited but otherwise peaceful celebration by several hundred people gathered outside of City Hall . . . . chant[ing] 'God Bless America' and boo[ing] Muslim and civil rights leaders as they left City Hall, separated by police barricades." *See* Def.'s Resp., Detroit News, Sept. 10, 2015 at Pg ID 582.

The AICC claims that in other instances of SALU applications for places of worship, the City provided specific instructions for revisions or postponed considering an application to afford the applicant an opportunity to amend the

application. However, the City did not provide the AICC the same opportunities to revise its SALU Application at the September 10, 2015 meeting. Moreover, in the last ten years, the only SALU Application for a place of worship that has been denied by the City was the AICC's SALU Application at issue herein.

As a result of the denial, the AICC filed a lawsuit against the City alleging: (1) multiple violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"); (2) violation of the First Amendment (rights to free exercise of religion, free speech and assembly); (3) violation of the Fourteenth Amendment (Equal Protection); (4) violation of the Michigan Constitution; and (5) violation of the Michigan Zoning Enabling Act.

The United States Department of Justice (DOJ) also investigated the denial of the AICC's SALU Application and filed a second lawsuit against the City alleging violations of the RLUIPA and discrimination against the AICC.

The DOJ, AICC, and City Representatives participated in facilitation with Magistrate Judge Anthony P. Patti. With the assistance of Magistrate Judge Patti, the parties fashioned a potential "global" resolution to the underlying lawsuits. The proposed Consent Judgment granted permission to the AICC to build the mosque. In exchange, the AICC agreed to provide off-site parking and the City would be allowed to institute permit parking in the neighborhood and the ability to

enforce its parking ordinances. In addition, the proposed height of the dome and spires structures was lowered. The Consent Judgment also mandated that all religious activities be conducted indoors, that there be no external amplification of sound, no call to prayer, and that the dome be painted with non-reflective paint. Additionally, the Consent Judgment allowed the City to resolve the DOJ lawsuit.

The City Council held a meeting on February 21, 2017 to determine whether the City should approve the Consent Judgment. Over 240 residents attended the meeting. Plaintiffs Youkhanna, Soro, Catchco, Jabbo, Rrasi and McHugh attended the meeting in order to express their opposition to the Consent Judgment. Because of the extraordinary amount of attendees, the City added seating in the vestibule located just outside Council chambers. The Mayor, Defendant Taylor, proposed that each speaker be limited to two minutes of speaking time. The Council had no objection. The City also broadcast the meeting on public television, which was also broadcast in the vestibule area where the overflow seating was located.

At the meeting, after the City Attorney explained the terms of the proposed Consent Judgment, she recommended that the settlement be approved. She indicated that the City was not admitting liability. Thereafter, attendees were invited to speak. Prior to public comment, however, Defendant Taylor, set

"ground rules" warning speakers to speak only on the agenda item and that speakers needed to follow the rules or they would be called out of order.

Despite these warnings, several loud and disruptive outbursts occurred. There were 26 interruptions by the audience, which caused multiple recesses. These outbursts included individuals speaking out of turn, shouting, applauding, and other disruptive behavior. During the Council's deliberations, the attendees began screaming at Councilman Douglas Skrzniarz, mid-sentence, forcing another recess. Upon returning, Defendant Taylor warned that any more interruptions would require him to clear the room to allow council to finish this agenda item. The attendees continued to disrupt the deliberations which caused another recess. At that point, Defendant Taylor ordered that attendees be removed from Council Chambers to the vestibule area where they could watch the vote without causing further disruptions and recesses. The media was not required to leave Council Chambers during the vote. The City Council ultimately voted to approve the Consent Judgment.

Plaintiffs filed the instant action on March 13, 2017, seeking to invalidate the Consent Judgment. Several of the Plaintiffs are Chaldean Christians from Iraq and at least one Plaintiff is an Assyrian Christian from Syria. They assert that Chaldean Christians in Iraq and Assyrian Christians in Syria have been subjected

to violence and abuse from ISIS and they oppose construction of the mosque at its proposed location. Some of the Plaintiffs live on Fifteen Mile Road, directly across the street from where the mosque is to be built, and yet others live nearby and travel on Fifteen Mile Road on a regular basis.

Plaintiffs allege that by approving the Consent Judgment and permitting construction of a mosque, the City granted AICC special rights and privileges because its SALU Application does not comply with the SHZO. Plaintiffs assert they are at risk of future harm as a result and request that enforcement of the Consent Judgment be preliminarily enjoined during the pendency of this lawsuit.

## III.   LAW & ANALYSIS

### A. Standard for Preliminary Injunctions

"A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). This equitable remedy preserves the relative positions of the parties until further proceedings on the merits can be held. *See id.* Whether to grant such relief is a matter within the discretion of the district court. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 540 (6th Cir. 2007). Four factors are balanced

in determining whether to grant a request for a preliminary injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Those factors are:

(1) whether the movant is likely to succeed on the merits;
(2) whether the movant is likely to suffer irreparable harm in the absence of preliminary relief;
(3) whether the balance of equities tips in the movant's favor; and
(4) whether issuance of an injunction is in the public interest.

*See id.*

"Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners,* 225 F.3d 620, 625 (6th Cir. 2000). The court should first address whether the movant shows a substantial likelihood of success on the merits. *See Bonnell*, 241 F.3d at 809. This is because a successful showing that a constitutional right is being threatened or impaired mandates a finding of the second factor, irreparable injury. *See id.* (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Applying the factors, the Court does not find that injunctive relief is appropriate at this juncture.

## B.  Success on the Merits

Plaintiffs argue they are likely to succeed on their claim that the Consent Judgment is invalid and unenforceable.  The Court approved the Consent Judgment without any findings that there was or will be an actual violation of federal law; the City expressly disavowed any liability.  Plaintiffs argue that the City Council

violated the SHZO laws because the City Council is required to consider the same standards as the Planning Commission but failed to do so before approving the Consent Judgment. *League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052 (9th Cir. 2007); *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264 (8th Cir. 2011)(state actors cannot enter into an agreement allowing them to act outside their legal authority . . . ."); *Perkins v. City of Chi. Heights*, 47 F.3d 212, 216 (7th Cir. 1995)(upon properly supported findings that such a remedy is necessary to rectify a violation of federal law, the district court can approve a consent decree which overrides state law provisions); *Kasper v. Board of Election Comm'rs*, 814 F.2d 332 (7th Cir. 1987); *Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs*, 142 F.3d 468 (D.C. Cir. May 1, 1998); *Vestevich v. W. Bloomfield Twp.*, 245 Mich. App. 759 (Mich. Ct. of App. 2001).

Contrary to the Plaintiffs' argument, they have not shown a strong likelihood of success on the merits of their claims. As an initial matter, Plaintiffs concede that the SHZO permits the City Council to approve a special land use via a Consent Judgment in order to resolve pending litigation. *See* SHZO, § 25.01(A) at Pg ID 558 ("The City of Sterling Heights Planning Commission shall have the power to approve or disapprove all special approval land uses, **except that the City Council shall be the approving authority with respect to special approval land uses**

**which have been approved by the City Council**.")(emphasis supplied).     While it is true that the City Council must consider the same factors under the SHZO, it is not required to reach the same conclusion as the Planning Commission.  *Id.* at § 25.01(C)("When the City Council is the reviewing authority with respect to a special approval land use, it shall have the same reviewing authority and shall consider the same standards as the Planning Commission under the special approval land use criteria applicable to such use in the particular zoning district and Article 25.")

The record reveals that as of the August 13, 2015 Planning Commission meeting, the AICC's SALU Application had met all the required objective criteria set forth in SHZO §3.02.   That the Planning Commission's review of the general discretionary criteria lead its members to conclude that the SALU should be denied does not mean the City Council was required to reach the same conclusion after its review of the general discretionary criteria set forth in SHZO §25.02.  The general discretionary standards of §25.02 require the exercise of discretion and judgment, including criteria such as harmony with the neighborhood.  As such, it is not surprising that differences of opinion regarding these factors has occurred.

Thus, *League of Residential Neighborhood Advocates* and similar cases cited by Plaintiffs are distinguishable from the instant matter because in all of those actions, a consent decree actually violated local zoning laws as opposed to the

Consent Judgment at issue herein. In *League of Residential Neighborhood Advocates*, the Los Angeles municipal code limited use of buildings or structures in residential zones to primarily one or two-family dwellings. 498 F.3d at 1055-56. However, conditional uses such as for places of worship are permitted after initial decision by the Zoning Administrator, public notice and public hearing. *Id.* at 1056.

After the Los Angeles Zoning Administrator denied the congregation's conditional use request, the congregation brought suit against the city of Los Angeles. *Id.* at 1053. The parties eventually settled, with the city denying any wrongdoing, but permitting the congregation to build a synagogue at the proposed residentially zoned site. *Id.* at 1054. Nearby residents to the proposed synagogue site brought suit alleging that the local zoning ordinances denied the city the authority to enter into such an agreement. *Id.* The Ninth Circuit Court of Appeals agreed, concluding that the settlement agreement "circumvented the procedural and substantive limitations contained in" the city code. *Id.* at 1057. This is unlike the situation herein, where the City Council was authorized under the SHZO to approve a special approval land use via a Consent Judgment to resolve pending litigation.

As such, because the City was authorized under the SHZO to approve the special approval land use by approving the Consent Judgment, the Court was not

required to make a finding that federal law had been violated. Rather, the Court was required to ensure that the agreement was fair, adequate, reasonable and consistent with the public interest. *United States v. Lexington-Fayette Urban Cty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (courts should consider fairness, adequacy, reasonableness and whether the agreement is consistent with the public interest). Here, the Court properly found that the Consent Judgment was fair, adequate, reasonable and consistent with the public interest. Thus, there is no basis to invalidate the Consent Judgment because its approval by the City did not violate the local zoning laws.[4]

Plaintiffs further argue that when the City approved the Consent Judgment, it did so in violation of Plaintiffs' due process rights. Specifically, Plaintiffs complain they were not provided notice of the City Council's meeting concerning the propriety of the City approving the Consent Judgment. Additionally, Plaintiffs were never served with a copy of the proposed Consent Judgment prior to the meeting.

---

[4] Both the AICC and the United States advance arguments concerning the strength of their claims rasied in their previous lawsuits in an apparent attempt to suggest that even if the Court was required to make explicit findings that the City had violated the RLUIPA, it is evident that such a violation occurred in connection with the AICC's request for a special approval land use. Because the Court concludes that the City's approval of the Consent Judgment did not violate the SHZO, it need not resolve the merits of the AICC's and the United States' claims in the underlying lawsuits.

Contrary to Plaintiffs' assertions, they had no right to a public hearing under the facts of this case. The SHZO states that public hearings are required for SALU requests except when "[t]he Planning Commission has previously held a public hearing on the request . . . or [t]he special approval land use proposed to be approved is within a development proposed to be developed pursuant to a consent judgment that is approved by the City Council to resolve pending litigation with the city." §25.03(A)(3)(a)-(b). As such, Plaintiffs complaints concerning lack of notice are of no merit. Notice is not required where no public hearing is required. MICH. COMP. LAWS § 125.3103(1). Nor does Michigan law require notice of the meeting's agenda. The applicable rules provide that "[a] copy of the agenda and supporting materials shall be prepared for Council Members, the City Manager, the City Attorney, and the press on or before 5:00 PM three working days before a regular Council meeting . . ." *See* Def.'s Resp., Ex. L, Rule 7. Thus, the rules do not require that a copy of the agenda be provided to the general public.

Plaintiffs also raise a variety of complaints about the Council's meeting. First, they argue that the Defendant Mayor's ad hoc rule limiting residents to two minutes to speak denied them their right to express their views. Plaintiffs further complain that the Mayor prohibited certain views from being expressed, specifically no one was permitted to mention religion or any statement deemed critical of Islam. Plaintiffs also state that the Mayor directed the City police to

seize individuals and escort them out of the meeting if the Mayor opposed what they were saying about the Consent Judgment. Lastly, the Mayor ordered all of the citizens out of the public hearing when it came time for the council members to cast their votes.

While Plaintiffs Youkhanna, Soro, Catcho, Jabbo, Rrasi and McHugh all spoke at various time during the meeting and never used the entire two minutes they were allotted to speak, they claim that the Defendants' threats and restraints on the content of their speech restricted and had a chilling effect on their First Amendment speech rights. Plaintiffs also argue that the Consent Judgment is invalid because its approval violated Michigan's Open Meetings Act because all the citizens were ordered out of the meeting prior to the Council's vote.

Plaintiffs' complaints concerning the February 21, 2017 City Council meeting do not support the conclusion that Plaintiffs are likely to succeed on the merits of their Due Process and First Amendment free speech claims. "A public body may establish reasonable rules and regulations in order to minimize the possibility of disrupting the meeting." MICH. COMP. LAWS § 15.263(1). Additionally, a person can be excluded from a meeting due to "a breach of the peace actually committed at the meeting." MICH. COMP. LAWS § 15.263(6). Lastly, Council may limit the amount of time that each person can speak at the

meeting.  MICH. COMP. LAWS § 15.263(5).  The rules further provide that citizen communications should be orderly during Council meetings, and that a person may be called to order if they fail to speak on matters germane to the business of the City, or if they use vulgarity or personally attack persons or institutions.  *See* Def.'s Resp., Ex. L, Rule 5.

Here, the facts of record demonstrate that after public comment, 26 interruptions, several warnings and three recesses, Defendant Taylor cleared the room of the disruptive crowd in order to conclude the item of business.  There was no secret vote or closed meeting as suggested by the Plaintiffs, since the meeting was broadcast to a local television channel, which was able to be viewed in the vestibule area where the residents were relocated once the Mayor ordered everyone out of Council chambers.

Based on the foregoing considerations, Plaintiffs do not have a strong likelihood of success on their claims.  This factor favors denying their request for preliminary injunctive relief.

### C.  Irreparable Injury

Plaintiffs argue that if the mosque is built at the proposed location, they will suffer harm by being deprived of the quiet use and enjoyment of their homes, as well as be subjected to serious traffic safety risks.  Plaintiff Rrasi claims that when

the City Council approved the AICC's SALU Application, she put her house up for sale, but has since taken it off of the market in the hopes the Consent Judgment will be invalidated by this lawsuit and she will not be forced to move. Defendants counter that Plaintiffs' Declarations are conclusory and provide no evidence supporting their contention they will no longer enjoy their property. The Court agrees with the Defendants that Plaintiffs have failed to present evidence of irreparable harm other than bare bones conclusions. This factor also does not favor granting preliminary injunctive relief.

### D. Harm to Others

Defendants argue that the AICC and the United States will be harmed if the Consent Judgment is invalidated because Plaintiffs have failed to bring this action against them yet they are necessary parties under Rule 19(b) of the Federal Rules of Civil Procedure. Both have an "interest relating to the subject of the action"— the Consent Judgment.

Moreover, Plaintiffs attempt to downplay the harm that AICC will suffer should the Court invalidate the Consent Judgment. They assert that the AICC cannot suffer because it already has a place of worship in Madison Heights. Plaintiffs also argue that the AICC filed an Amicus Brief and did not argue it will be irreparably harmed should the Court grant a preliminary injunction. Plaintiffs assert that the Department of Justice is not a party to the underlying lawsuit

between the AICC and the City, nor the Consent Judgment, thus it is not a necessary party under Fed. R. Civ. P. 19.[5]

Based on the parties' arguments, the Court finds that preliminary injunctive relief would harm the AICC and its members, as well as the City and the United States. This factor also supports denying the Plaintiffs' Motion for a Preliminary Injunction.

### E. Public Interest

Plaintiffs maintain that a preliminary injunction will serve the public interest because if the mosque is constructed, the public will be subject to great harm because of the traffic problems that will ensue. They further argue that the Consent Judgment is inadequate and lacks standards needed for construction of the mosque and compliance with the terms of the agreement between the City and the AICC.

Conversely, Defendants assert that invalidating the Consent Judgment and subjecting the City to suit that could be acrimonious and costly is not in the public interest. Here, the Court finds that the public interest is best served by denying the request for injunctive relief because the Consent Judgment represented a voluntary

---

[5] While the Government was not a party to the case between the AICC and the City, the Consent Order entered in the DOJ's lawsuit against the City references the Consent Judgment in *American Islamic Community Center, Inc. v. City of Sterling Heights*, No. 1:16-cv-12920 (E.D. Mich. Mar. 10, 2017).

resolution to what could have been strongly contested and lengthy litigation between the City, the AICC and the United States. This factor likewise fails to support Plaintiffs' Motion for a Preliminary Injunction.

## IV.    CONCLUSION

For the reasons discussed above, the Plaintiffs' Motion for Preliminary Injunction [#9] is DENIED.

SO ORDERED.

Dated:  June 28, 2017                                    /s/Gershwin A. Drain
                                                        GERSHWIN A. DRAIN
                                                        United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 28, 2017, by electronic and/or ordinary mail.
/s/ Tanya Bankston
Deputy Clerk