UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAMAL ANWIYA YOUKHANNA,
*et al.*,

              Plaintiffs,

                                   Case No.: 17-cv-10787

v.                                  Honorable Gershwin A. Drain

CITY OF STERLING HEIGHTS,
*et al.*,

              Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[#69] AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [#67]

## I.    INTRODUCTION

Presently before the Court are the parties' cross motions for Summary Judgment. These matters are fully briefed and a hearing was held on May 7, 2018. For the reasons that follow, the Court will grant the Defendants' Motion for Summary Judgment and will deny the Plaintiffs' Motion for Summary Judgment.

## II.    FACTUAL BACKGROUND

The instant dispute stems from the American Islamic Community Center, Inc.'s ("AICC") attempt to build a mosque in the City of Sterling Heights, which permits places of worship and religious community centers in residential zoned (R-

60) areas through special land use.

In 2015, the AICC applied for a special land use with the City to build a mosque on Fifteen Mile Road between Ryan Road and Mound Road. After working with then City Planner Donald Mende for approximately one year, the AICC appeared at a public hearing before the City's Planning Commission on August 13, 2015, seeking approval of its application. At the meeting, Mende reported that the application met all of the objective standards set forth in the zoning code. He indicated that the mosque would cover approximately 11% of the property, well under the 30% limit on R-60 zoned property, the height of the mosque's dome and spires complied with the zoning code, and the proposed 130 parking spaces exceeded the required 109 spaces. Mende further reported that the location of the mosque on a major thoroughfare was also appropriate.

Mende next discussed whether the discretionary standards of the zoning code had been met. This included consideration of the paint to be used, that no audio devices would be used outside of the building, allowance of future liquor sales at nearby businesses, and limiting use of the multi-purpose room to AICC members only. He further discussed that increased traffic was not a concern because "[t]he average traffic counts [sic] at this location is approximately 11,000 vehicles per day, which is actually average for major roads" and that "accidents have actually been steadily decreased since 2011." Mende recommended that the

AICC's application be approved.

The Commission thereafter took public comments. Audience members raised concerns about traffic, size, use of the building, and safety. During deliberations, Commissioner Jeffrey Norgrove, also a Plaintiff herein, indicated that he was thinking of asking for a "full impact study with socioeconomic numbers" and stated that "I'm not exactly comfortable with making this decision tonight after everything I've heard." Commissioner Jerry Rowe suggested a postponement to allow the AICC to "review the scale of the building." Commissioner Stephan Milltello challenged the postponement stating that "I would be against [postponing] . . . [I]f this was a church, a Catholic Church or anything else, we wouldn't be, we wouldn't [need a postponement]." The Commission then voted 6 to 1 to postpone the matter.

On September 10, 2015, the AICC appeared again at another public hearing before the Commission, seeking approval of its Application based on revised plans submitted to the City following the August 13, 2015 meeting. Over 200 people attended this meeting and, before the meeting, many of them engaged in protests outside of City Hall against the building of the mosque. At the meeting, Mende reported that the AICC had agreed to reduce the height of the mosque's spires by approximately 13% and increase the size of the dome by 12%. At the meeting's conclusion, Plaintiff Norgrove made a motion to deny the AICC's application

based on the following discretionary standards set forth in §25.02 of the zoning code: the location and height of the mosque interferes with and discourages the appropriate development and use of adjacent land and buildings, lack of size compatibility with established long term development patterns, a likely shortage of off-street parking when the principal and ancillary uses are combined, additional parking spaces are required, and the scale of the mosque is not harmonious with the neighboring areas. The Commission then voted to deny the application.

The AICC disagreed with the Commission's decision, essentially claiming that the denial was pretext and was truly based upon religious discrimination. Thereafter, the AICC filed a lawsuit against the City alleging, among other things, multiple violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000c, *et. seq.*, as well as violation of the AICC's First Amendment right to the free exercise of religion.

The United States Department of Justice ("DOJ") also investigated the denial of the application and filed a lawsuit alleging the Commission's decision violated the RLUIPA and discriminated against the AICC. The DOJ further alleged that Plaintiff Norgrove attended an anti-mosque protest on August 30, 2015 and improperly influenced the other Commissioners due to his alleged bias against Muslims. In addition, the DOJ asserted that Plaintiff Norgrove opposed the construction of a different mosque in 2011 and posted anti-Islamic statements on

his social media stating: "Oh no the terrorists are gonna attack, according to the media this weekend. Come to the Detroit area. They don't [sic] bomb their revenue source." The DOJ also claimed that Norgrove shared a picture of a pig with the statement "share this pig if your [sic] not celebrating Ramadan [sic]." Finally, the DOJ maintained that Norgrove contacted Commissioners between the first and second meetings and informed them that he would be making a motion to deny the application.

The City's answer to the complaints denied any wrongdoing, maintaining that the decision by the Commission was based on legitimate land use concerns. The parties participated in facilitation with Magistrate Judge Anthony Patti. With the Magistrate Judge's assistance, the parties fashioned a potential resolution of the lawsuits taking into consideration the issues raised by the Commission, as well as balancing the AICC's right to free exercise of religion.

The potential resolution was proposed to the City Council at its February 21, 2017 meeting. More than 240 people attended the meeting, which exceeded the capacity of Council Chambers so the City added seating in the vestibule located outside of the Chambers. The City employed a "one in, one out" procedure to allow audience members to rotate into the Chambers to provide their comments. Due to the size of the audience, Mayor Michael Taylor, a named Defendant in these proceedings, proposed that speaking time be limited to two minutes per

person so that everyone present would have an opportunity to speak. The vestibule area outside of Chambers had windows through which audience members could watch the meeting and televisions on which the meeting was broadcast live.

The meeting began with the City's Attorney, Ann McClorey McLaughlin, who explained the terms of the Consent Judgment and the concessions received. *See* Defs.' Mot. for Summ. J., Ex. L, 2/21/17 Mtg. Video at 1:42:00-48:06). Specifically, she indicated that the Consent Judgment would approve a special land use to build the mosque in the City and that the AICC agreed to reduce the height of the mosque's dome and spires, to provide off-site parking and shuttling for events exceeding available on-site parking, and not to use any outdoor sound projection or call to prayer. *Id.* McLaughlin further explained that the Consent Judgment required that the dome be painted with non-reflective paint, that all religious activities be conducted indoors, and affirmed the City's ability to institute permit parking on surrounding residential streets and to enforce parking ordinances. *Id.* She noted that the City was not admitting liability and that by resolving the matter now, the City could control the situation rather than leaving it to a judge or jury to decide. *Id.*

After McLaughlin concluded her comments, Defendant Taylor opened the floor for public comment, having previously provided the following explanation of the City's Rules:

We have 181 seats, I believe, in this Council Chamber; every seat is taken (save for maybe one or two) and we also have overflow of at least 25 to 30 or more in the vestibule. So, it is currently 9:07 p.m. . . we have other agenda items to get to on the agenda tonight aside from this . . . . Our Council Rules allow for us to reduce the speaker time limit and judging by the size of the crowd unless there is objection from Council, I recommend reducing the speaker time on this item only to two minutes . . . . Speakers will be required to stay on point. Your comments during this agenda item must be related to this agenda item. This agenda item is to consider settlements, consent order, and consent judgments in these two cases . . . . If you fail to abide by the Council's Rules, you will be called out of order . . . and you will be asked to go back to your seat. If you do not go back to your seat, we will recess and you will be removed from the auditorium. So please don't make us do that . . . . Outbursts from the audience can be grounds for being called out of order . . . . So again, let's just please be as respectful as we can of each person. We do not need any comments about anybody's religion, that is not the purpose of this meeting tonight and any comments regarding other religions or disagreements with religions will be called out of order. It's simply not relevant to what's going on tonight.

*Id*. at 1:37:49-41:02. Despite Defendant Taylor's ground rules, there were twenty-six outbursts by audience members, both individually and as a body, forcing multiple recesses. The outbursts included people speaking out of turn, shouting, applauding, and other disruptive behavior, including attacks on Islam and the AICC for being "terrorists" and wanting to "destroy the American Constitution." *Id*. at 2:20:35-21:14,2:32:54-33:43.

With respect to the Plaintiffs herein, all of the Plaintiffs who were in attendance were permitted to speak uninterrupted and none of the Plaintiffs chose

to utilize their full two-minute speaking time.  *Id*. at 1:52:37-53:48, 1:53:54-55:27. 1:59:05-37, 2:03:11-41, 2:59:00-25.  After every audience member who wished to speak was heard, a motion was made by Councilman Douglas Skrzniarz to approve the Consent Judgment.  *Id*. at 3:04:09-54.  During Council's deliberation, the audience began screaming at Councilman Skrzniarz, mid-sentence, forcing another recess.  *Id*. at 3:04:56-08:13.

When Defendant Taylor was in the process of calling this recess, Plaintiff Rrasi approached the dais and began speaking loudly at Defendant Taylor. Defendant Taylor has specifically testified that Plaintiff Rrasi "came close to the council diaz [sic] and was making gestures with her hands, making threatening comments, and was being disruptive . . . I was trying to do my best to maintain order in there, and in a split second I recall Debi coming up, making a threatening gesture, coming towards the council table, and I believe I asked that the police officer to escort her out."  *See* Taylor Dep. at 101:2-5; 102:10-15.  After Defendant Taylor asked that she be escorted out of Council Chambers, Plaintiff Rrasi began yelling at him because she was mad.  Because she refused to leave chambers, the officer proceeded to escort her out of the room.  *See* Rrasi Dep. at 53:14-18, 54:1-25; 55:1-2.

Upon returning from recess, Defendant Taylor warned the audience that any more interruptions would require him to clear Chambers to allow Council to

8

conclude the agenda item. Ignoring his warning, the audience members continued to interrupt the meeting multiple times. As a result, Defendant Taylor called another recess and ordered that all audience members except for the press be removed to the vestibule where they could view the proceedings. Council returned from recess and voted to approve the Consent Judgment.

Thereafter, Plaintiffs filed the instant action against the City and Taylor claiming that the Consent Judgment was approved in violation of the City's Zoning Code and Michigan law. They also assert violations under the Due Process, Equal Protection and Establishment Clauses and the First Amendment. Plaintiff Rrasi has also alleged a Fourth Amendment unlawful seizure claim.

## III.   LAW & ANALYSIS

### A.    Standard of Review

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact

to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

**B.** **Validity of the Consent Judgment**

**1.** **The City's Zoning Code and the Michigan Zoning Enabling Act ("MZEA")**

The crux of Plaintiffs' Complaint is that the approval of the Consent Judgment should be invalidated because the Council purportedly failed to abide by the City's Zoning Code by neglecting to consider the discretionary standards set forth in § 25.02. Plaintiffs' further assert that the Consent Judgment should be invalidated because the City did not comply with the notice requirements under the MZEA. Both of Plaintiffs' arguments are without merit.

Plaintiffs' first argument rests on the theory that the terms "reviewing authority" and "approving authority" are used interchangeably in the Zoning Code. The relevant provisions state that:

> When the City Council is the reviewing authority with respect to a special land use, it shall have the same reviewing authority and shall consider the same standards of the Planning Commission under the special approval land use criteria applicable to such use in a particular zoning district and Article 25.

Zoning Code, § 25.01(C). Thus, the Zoning Code unambiguously requires the City Council to consider the discretionary standards with respect to a special land use application when it is the "reviewing authority." Conversely, when City Council is designated the "approving authority" only, the Zoning Code is silent with respect to the same requirement to consider the discretionary standards under the Code. *Id*. at § 25.01(A)(4) (stating that the City Council shall be the approving authority with respect to special approval land use pursuant to a consent judgment).

Plaintiffs have cited no provision in the Code which designates the Council as the reviewing authority when it approves a special land use by consent judgment to settle pending litigation. In fact, Plaintiff Norgrove, a former Commissioner, has testified that there is a distinction between the terms approving authority and reviewing authority under the Zoning Code. Plaintiffs' reliance on § 25.03(A)(2) in support of their position is unavailing because this provision is only applicable when the Council is the "reviewing authority." *Id*. at §25.03(A)(2).

Plaintiffs' position is further undermined by the fact that §25.01 has been amended. The former version of the section stated that "[t]he City Council shall be the reviewing authority with respect to a special approval land use which is requested pursuant to a Planned Unit Development project, a conditional rezoning, or consent judgment . . . ." 2005 Zoning Code, § 25.01. The Code current

iteration of this section removes Council as the reviewing authority over the settlement of lawsuits by consent judgment, adopting the current language of the Code. 2009 Zoning Code, § 25.01. This change effectively removed the requirement that Council consider subjective standards set forth in § 25.02 before granting a special land use by consent judgment. This court must enforce the current Zoning Code as written and may not read words into the ordinance or read into the ordinance authority above and beyond the express authority conferred. *See Brandon Charter Twp. v. Tippett*, 241 Mich. App. 417, 616 N.W.2d 243 (2000).

In support of their position, Plaintiffs continue to rely upon *League of Residential Neighborhood Advocates v. Cty. of Los Angeles*, 498 F.3d 1052 (9th Cir. 2007), in support of their position. However, in *League of Residential Neighborhood Advocates*, the City of Los Angeles's Zoning Code did not permit the City Council to approve a special land use as part of a Consent Judgment. In contrast, the City Council of Sterling Heights is permitted to approve a special land use by consent judgment. *League of Residential Neighborhood Advocates* has no bearing on the instant dispute.

Additionally, Plaintiffs also rely on *Pentecostal Church of God v. Douglas Cnty.,* No. 3:16-CV-00400-LRH-WGC, 2018 WL 1611184 (D. Nev. Apr. 2, 2018), which is connected to their argument that the Consent Judgment is invalid under *League of Residential Neighborhood Advocates.* This argument is likewise

without merit.  *Pentecostal Church of God* is distinguishable from the instant matter because in that case there was no suggestion of religious animus in the decision to deny a special land use for a church.  Conversely, the AICC and the DOJ lawsuits alleged that then Planning Commissioner, Plaintiff Norgrove, made anti-Islamic posts on the internet, previously opposed the construction of another mosque, attended an anti-mosque protest, and contacted other Planning Commissioners prior to the vote to approve the mosque to inform them he would be making a motion to deny the AICC's application.  As such, Norgrove's conduct placed the City at risk of being found to have violated federal law.  As such, there is no merit to Plaintiffs' reliance on this authority.

Plaintiffs further claim that the City violated the MZEA because it failed to give proper notice of the February 21, 2017 meeting's agenda item.  However, Plaintiffs read a key word out of the statute, which states that notice is only required when an "application" for special land use is filed.  While an application was filed by the AICC, the City did comply with MZEA because it conducted two public hearings on the application and denied it.  The Consent Judgment was a settlement of the subsequent lawsuits filed by the AICC and DOJ stemming from the Commission's denial of the application.  Moreover, the Zoning Code expressly provides that a public hearing is not required when Council approves a special land use by consent judgment to settle pending litigation.  Zoning Code, §

25.03(A)(3)(b).

Accordingly, because the Consent Judgment was not approved in violation of the Zoning Code or the MZEA, summary judgment is appropriate on Plaintiffs' Declaratory Judgment claim.

## 2.    Michigan Open Meetings Act ("OMA")

Plaintiffs also seek to invalidate the approval of the Consent Judgment by claiming the City violated the OMA by removing audience members during the meeting.  This claim is also due to be denied.

The OMA provides "[a]ll meetings of a public body shall be open to the public and shall be held in a place available to the general public."  MICH. COMP. LAWS § 15.263(1).  Also, "a public body may establish reasonable rules and regulations in order to minimize the possibility of disrupting the meeting." *Id.*  A person can be excluded from a meeting due to "a breach of the peace actually committed at the meeting."  *Id.* at § 15.263(6).  Lastly, a council may limit the amount of time that each person can speak at a meeting.  *Id.* § 15.263(5).

Consistent with the OMA, the City's rules state that "[n]o comments shall be made from another location, and anyone making 'out of order' comments may be subject to removal from the meeting."  Moreover, [t]here will be no demonstrations during or at the conclusion of anyone's remarks or presentation," and "[t]hese rules are intended to promote an orderly system of holding a public

hearing, to give every person an opportunity to be heard, and to ensure that no individual is embarrassed by exercising his or her right of free speech." Rules at 7. The rules also provide that "[a] person may be called to order by the Chair or any Council member for failing to be germane to the business of the City, for use of vulgarity, for a personal attack on persons or institutions . . . ." Rules at 5. Lastly, Robert's Rules of Order govern City Council meetings to the extent they do not conflict with City's rules. As such, pursuant to Robert's Rules, the Council has the right to remove a person from the meeting.

In the instant case, the Mayor removed audience members only after public comment was completed and 26 interruptions, several warnings, and 3 forced recesses so that Council could conclude the agenda item. The removed audience members were permitted to watch the remainder of the agenda item and live vote through the windows and on television in the vestibule of chambers. Moreover, the entire meeting was streamed live on the City's website and YouTube channel and was broadcast live on cable television. To the extent that Plaintiffs suggest that the Council conducted its vote in secret, the evidence before this Court shows otherwise. Plaintiffs have failed to come forward to demonstrate that the OMA was violated. Under the OMA, the City was authorized to remove the unruly and disruptive audience members without turning the vote on the Consent Judgment into a secret vote. Defendants, as opposed to Plaintiffs, are likewise entitled to

summary judgment on this issue.

## B.  Due Process

Plaintiffs further argue that because of the "alleged failure to provide proper notice and an opportunity to be heard, Defendants deprived Plaintiffs of their right to due process."  However, Plaintiffs have alleged no cognizable property interest. In order to have a protected property interest, "one must possess more than a unilateral expectation to the claimed interest; the claimant must have a legitimate claim of entitlement."  *York v. Civil Serv. Comm'n*, 263 Mich. App. 694, 689 N.W.2d 533, 539 (2004).  Yet, even neighboring landowners do not have a legally protected property interest with respect to claims of increased traffic and generalized aesthetic and economic loss.  *See, e.g., Unger v. Forest Home Twp.*, 65 Mich. App. 614, 237 N.W.2d 582, 584 (1975).

Here, Plaintiffs Norgrove, Jabbo, Catcho, and Rrasi do not own property near the location of the proposed mosque.  While Youkhanna and McHugh own real property ¾ of a mile and 3 miles away from the site of the proposed mosque, there is no evidence that they have been deprived of any interest in that property, or, if they were, that the alleged deprivation is anything other than generalized, unsupported grievances concerning traffic and loss of aesthetic and economic value.

Plaintiffs are not entitled to summary judgment on Plaintiffs' Due Process

claim. Rather, Defendants are entitled to summary judgment on Plaintiffs' Due Process claim.

### C. First Amendment and Equal Protection

Plaintiffs next argue that their speech was improperly restricted and that they were treated differently under the City's rules. Because their claim involves an intersection of the First Amendment and the Equal Protection Clause, the United Supreme Court has instructed courts to decide both claims under a First Amendment analysis. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 384 n.4 (1992).

Specifically, Plaintiffs claim their speech was impermissibly chilled when they and other audience members were limited to a two-minute speaking time, prevented from speaking critically of the Islamic faith, and removed from the meeting for being disruptive. However, "[t]he First Amendment does not guarantee persons the right to communicate their views at all times or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981). When the government designates a limited public forum for speech, as is the case of a city council meeting, it may apply restrictions to the time, place, and manner of speech so long as those restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Jobe v. City of Catlettsburg*,

409 F.3d 261, 266 (6th Cir. 2005).

In *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427 (6th Cir. 2009), the United States Court of Appeals for the Sixth Circuit considered whether a school board policy was content-neutral and narrowly tailored to serve a significant government interest. Under the policy, persons were allowed to apply to speak and they would be permitted to speak for a maximum of five minutes provided the content of their speech was "not frivolous, repetitive, nor harassing." *Id.* at 433. The Sixth Circuit held that the policy was both content-neutral and narrowly tailored:

> The policy's stated justifications include: allow[ing] everyone a fair and adequate opportunity to be heard;" "assur[ing] that the regular agenda of the Board is completed," and "recogniz[ing] the voluntary nature of the Board['s]time and us[ing] that time efficiently." Each of these justifications has nothing to do with the subject of an individual's proposed speech and everything to do with conducting orderly, productive meetings. The school board's policy is narrowly tailored because it prohibits speech only when it is "repetitive," "harassing" or "frivolous."

*Id.* Courts have recognized that a person may be entirely excluded from a limited public forum without violating the Constitution when the person is disruptive or wishes to speak on a topic not encompassed within the purpose of the forum. *See, e.g., Freedom from Religion Found., Inc. v. City of Warren*, 873 F. Supp.2d 850, 863 (E.D. Mich. 2012); *Beaton v. City of Allen Park*, No. 14-CV-13590, 2015 WL

3604951 (E.D. Mich. 2015); *Jones v. Heyman*, 888 F.2d 1328, 1333 (11th Cir. 1989). Lastly, alternative channels of communication need not be the best means of communication if the intended audience can still be reached. *Phelps-Roper v. Strickland,* 539 F.3d 356, 372-73 (6th Cir. 2008).

In this case, the purpose of the February 21, 2017 meeting was to discuss the approval of the Consent Judgment, thus comments about Islam were irrelevant to the discussion before the Council. Moreover, Defendant Taylor indicated at the outset that commentary regarding anyone's religion was not relevant to whether the Consent Judgment should be approved and the reason for the speaking limitation and removal provision was to maintain order and to ensure that all audience members wishing to speak had the opportunity to do so. As such, Plaintiffs have failed to come forward with any evidence that the City's rules were not content-neutral or narrowly tailored.

Additionally, Plaintiffs had ample alternative channels of communication. The City established a location just outside City Hall, where individuals, including the Plaintiffs, could gather and express their opinions and concerns about individuals who practice Islam, terrorism and other views not germane to whether the Consent Judgment should be approved. Lastly, the contact information for each Councilmember is available on the City's website and Plaintiffs were able to contact the members to express their views.

For these reasons, Defendants are likewise entitled to the summary judgment on Plaintiffs' First Amendment and Equal Protection Clause claims.

### D. Fourth Amendment

Plaintiff Rrasi claims that her Fourth Amendment rights were violated when she was removed from the City Council meeting. As an initial matter, the February 21, 2017 meeting was a limited public forum and Defendant Taylor was allowed to restrict non-germane speech and remove individuals who were being disruptive without violating the Constitution. Moreover, interference with a city official during the performance of official duties is a misdemeanor offense. *See* City Ordinance, §35-16(M).

Here, the record reveals that Plaintiff Rrasi approached the dais and used gestures in a threatening manner. She was escorted out of Chambers when she refused to leave after being called out of order by Defendant Taylor. As such, there was no unlawful seizure under the facts of this case. In any event, even if an unlawful seizure occurred, Defendant Taylor would be entitled to immunity because he was engaged in a legislative activity. *See Hogan v. Twp. of Haddon*, 278 F. App'x 98, 104 (3d Cir. 2008). Summary judgment is therefore denied to the Plaintiffs on this claim and granted in favor of the Defendants.

### E. Establishment Clause

Lastly, Plaintiffs' Establishment Clause claim is without merit and

Defendants are entitled to summary judgment in their favor. The law is well settled that "[s]ince the advent of zoning, churches have been held proper in residential districts" and that "[t]he concerns underlying the Establishment Clause arise not when religion is allowed by government to exist or even flourish, but when government sets a religious agenda or becomes actively involved in religious activity." *Boyajian v. Gatzunis*, 212 F.3d 1, 9-10 (1st Cir. 2000) (internal quotation marks and citations omitted).

Government action does not violate the Establishment Clause where it has a secular legislative purpose, its principal or primary effect neither advances nor inhibits religion by conveying a message that the government was endorsing a religion, and it does not foster an excessive government entanglement with religion. *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 590 (6th Cir. 2015) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) and *Lynch v Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor J. concurring). When determining the purpose of government action or the effect of its implementation, the court must view the evidence from the perspective of a reasonable observer. *Smith*, 788 F.3d at 590. The reasonable observer is deemed aware of the history and context of the community as well as the context in which the challenged government activity took place. *Id*.

Based on the evidence, the Court is compelled to conclude that a reasonable

observer would know that the purpose of the speech restrictions at the Council meeting were designed to facilitate an orderly and productive meeting that permitted all audience members an opportunity to speak on whether the Consent Judgment should be approved.  The purpose of the Consent Judgment was to permit the AICC the free exercise of religion through a special land use and to resolve pending litigation against the City.  Moreover, the City has no connection to the AICC or the proposed mosque, thus there is no entanglement with Islam. Here, the City did not violate the Establishment Clause by enabling the AICC's members the free exercise of religion by approving the Consent Judgment and thereby permitting a special land use for the construction of the mosque.

## IV.    CONCLUSION

Accordingly, for the reasons articulated above, Defendants' Motion for Summary Judgment [#69] is GRANTED.

Plaintiffs' Motion for Summary Judgment [#67] is DENIED.

SO ORDERED.

Dated:  August 1, 2018                                      /s/Gershwin A. Drain
                                                                        GERSHWIN A. DRAIN
                                                                        United States District Judge

## CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 1, 2018, by electronic and/or ordinary mail.
<u>/s/ Tanya Bankston</u>
Deputy Clerk